OPINION
{¶ 1} Plaintiff-appellant/cross-appellee, Robert L. Thomas, appeals a decision of the Butler County Court of Common Pleas, Domestic Relations Division, terminating his marriage to defendant-appellee/cross-appellant, Debbie C. Thomas, dividing the parties' assets and liabilities, and awarding spousal support to Debbie.
 {¶ 2} The parties were married in 1978 and have one child, Melissa, who is emancipated. Both parties are in their early 50's and are in good health. Robert received a Bachelor's degree in business in 1974 and has been self-employed since 1975, owning and operating a real estate appraisal business. Robert began as a sole proprietor under the name of "Robert L. Thomas, Real Estate Appraiser." In 1995, he converted the sole proprietorship to a partnership with Debbie under the name of "The Thomas Group." In April 2001, Robert converted the business back to a sole proprietorship under the name of "Thomas Inspections." The name change reflected a change in work from real estate appraisals to home inspections, due to an economic decline in real estate appraisals over the last several years. Robert explained that the decline in business was caused by the loss of a major client and by the banks' unwillingness to pay the set fees for real estate appraisals. Although Robert used to be able to charge $250 per appraisal, he was ultimately forced to reduce his fees to $125 per appraisal.
 {¶ 3} Debbie received a Bachelor's degree in elementary education in 1974. During the 1977-1978 school year, Debbie taught first grade earning $8,000 a year. During the 1978 summer recess, she worked for Armco Steel in a secretarial-clerical position. At the end of the summer, she did not go back to teaching but kept working for Armco Steel until Melissa's birth in July 1983. When her maternity leave expired, Debbie returned to work but terminated her employment with Armco Steel four months later to stay home with Melissa. At the time, Debbie was earning $23,000 a year.
 {¶ 4} In 1993, Debbie began working part-time, 15 to 20 hours a week, at Robert's office performing clerical tasks. At about the same time, then eleven-year-old Melissa began suffering from a subcategory of epilepsy which made her susceptible to seizures upon awakening. Melissa's condition was later complicated by the onset of puberty which produced additional seizure activity during ovulation. As a result, Debbie made sure she was home when Melissa woke up in the morning and came home from school in the afternoon. Debbie last worked at her husband's office in July 2000. She never received a salary while working there. At the time of the final hearing in November 2001, Debbie was working 25 hours a week at a law office earning $7 per hour.
 {¶ 5} Robert filed for divorce on October 12, 2000. That same day, the trial court issued a temporary order requiring the parties to maintain and keep in force their current health insurance policy, and to "continue to pay their marital debts and obligations in accordance with the established practices of the household." In February 2001, Debbie filed a contempt motion against Robert for twice failing to pay the premiums for the parties' health insurance policy. The record shows that Debbie, who was then not earning an income, had to pay both premiums by first cashing her IRA, and then borrowing money from her sister. The motion stated that Melissa's pre-existing condition would not be covered under a new policy were their policy to lapse.
 {¶ 6} By an agreed magistrate's decision, the parties agreed to open a second mortgage/line of credit on their marital residence "for [the] purpose of paying the health insurance premiums for Jan 2001 and March 31, 2001." The magistrate's decision further stated that "[n]o other charges to said line of credit shall be made by either party unless agreed by both. *** [A]ll other temporary orders stay in effect." In May 2001, Debbie again filed a contempt motion against Robert for using the line of credit for purposes other than paying the health insurance premiums. While overruling the motion, the magistrate found that Robert had used the line of credit to pay delinquent real estate taxes on the marital residence. The magistrate's decision forbade both parties to use the line of credit without the written agreement of the other.
 {¶ 7} A final hearing on the parties' property was held in August 2001 and continued on November 26, 2001. The hearing revealed that in addition to the marital residence, the parties owned two office buildings used by Robert for his business, six rental properties, a 1998 Starcraft and its trailer, and several vehicles. By judgment entry and divorce decree filed on May 8, 2002, the trial court divided the parties' marital assets and liabilities, and ordered Robert to pay the second mortgage/line of credit on the marital residence as well as a $4,799 MasterCard debt which included $2,500 in attorney fees charged by Debbie. The trial court imputed Robert an annual income of $43,632.50, imputed Debbie an annual income of $14,500, and ordered Robert to pay Debbie $958.33 a month in spousal support until the death of either party, Debbie's remarriage or cohabitation in an intimate type relationship, or ten years, whichever came first. The trial court reserved jurisdiction over spousal support. Finally, the trial court awarded Robert a 1996 Dodge Intrepid he had bought for Melissa. This appeal follows in which Robert raises four assignments of error which will be addressed out of order. Debbie cross-appealed, raising one assignment of error.
 {¶ 8} In his first assignment of error, Robert argues that the trial court abused its discretion by ordering him to pay the entire MasterCard debt, which included $2,500 in attorney fees charged by Debbie, especially since the trial court found that each party had sufficient assets to pay their own attorney fees.
 {¶ 9} A trial court is vested with broad discretion in fashioning an equitable division of marital property. Donovan v. Donovan (1996),110 Ohio App.3d 615, 620. A reviewing court "should not review discrete aspects of the property division out of context of the entire award."Baker v. Baker (1992), 83 Ohio App.3d 700, 701. Instead, a reviewing court should consider whether the trial court's disposition of marital property as a whole resulted in a property division that was an abuse of discretion. Id. A reviewing court may modify a property division only if it finds that the trial court abused its discretion by dividing the property as it did. Cherry v. Cherry (1981), 66 Ohio St.2d 348, 355.
 {¶ 10} By decision filed January 29, 2002, the trial court first carefully divided the parties' assets and liabilities. Robert was awarded several marital assets as well as all of the parties' marital debts, including the MasterCard debt. Once the parties' marital property was divided, the trial court then addressed attorney fees as follows: "The Court has equally divided all marital assets and debts. After reconciliation, each party receives net marital equity in the amount of $258,344.10.[1] In addition to receiving net marital equity, the Court has ordered Mr. Thomas to pay Ms. Thomas spousal support for a period of ten years. The Court finds each party has sufficient assets to pay their own attorney fees."
 {¶ 11} Contrary to Robert's assertion, there is no conflict between the foregoing attorney fees provision and the allocation of the entire MasterCard debt to Robert. The MasterCard debt was clearly allocated to Robert as part of the division of the parties' marital property. The trial court's subsequent finding that each party had sufficient assets to pay their own attorney fees clearly did not involve the $2,500 attorney fees charged by Debbie on the MasterCard card. Rather, it dealt with the parties' own attorney fees other than the ones charged by Debbie on the MasterCard card.
 {¶ 12} In addition, the record shows that Robert paid $5,250 in attorney fees between November 2000 and October 2001, that is, before the November 26, 2001 final hearing on the parties' marital property. It is well-established that unless a different date is chosen by the trial court, for purposes of dividing marital property in a divorce case the marriage is deemed terminated as of the final hearing date. R.C.3105.171(A)(2)(a). Robert testified that payment for his attorney fees either came from cash from the rental properties, from a credit card, or from the business account. In light of the fact that $5,250 of Robert's attorney fees were paid during the marriage with marital assets, we cannot say that the trial court abused its discretion by allocating the entire MasterCard debt to Robert, including the $2,500 in attorney fees charged by Debbie. Robert's first assignment of error is overruled.
 {¶ 13} In his third assignment of error, Robert argues that the trial court erred by awarding him the 1996 Dodge Intrepid. Robert asserts that the trial court abused its discretion by crediting him with the value of the vehicle when the vehicle was not in either party's possession but in Melissa's possession.
 {¶ 14} It is undisputed that Robert purchased the vehicle for Melissa with marital funds in August 2000. Robert paid $5,606 for the car. At the beginning of the August 2001 hearing, Robert's attorney acknowledged to the trial court that while the vehicle was in Melissa's possession, the vehicle was in Robert's name.
 {¶ 15} When viewed in the context of the entire property division, we cannot say that the trial court's award of the vehicle's value to Robert amounts to an abuse of discretion. Because it was purchased with marital funds, the vehicle was a marital asset which had to be allocated to either Robert or Debbie. In equitably and nearly equally dividing the parties' marital assets and liabilities, the trial court awarded Debbie one vehicle while awarding Robert the 1998 Starcraft and trailer and three vehicles including the 1996 Dodge Intrepid. Such award is not so unreasonable, unconscionable, or arbitrary as to amount to an abuse of discretion. Robert's third assignment is accordingly overruled.
 {¶ 16} In his fourth assignment of error, Robert argues that the trial court abused its discretion by ordering him to pay the $8,366 second mortgage/line of credit on the marital residence. Robert asserts that he is being punished for violating a court order that did not yet exist.
 {¶ 17} Upon dividing the parties' assets and liabilities, the trial court addressed the issue regarding the payment of temporary orders as follows: "While this matter was pending Mr. Thomas was ordered to maintain the parties' health insurance and pay the real estate taxes on the residence. Mr. Thomas failed to pay as ordered by the Court.
 {¶ 18} "In order to avoid the lapse of the medical insurance, the Court permitted a line of credit against the marital real estate. At the time of the hearing, the balance due was $8,366.00. The Court finds there were sufficient monies available to maintain the health insurance and the taxes. Instead of paying as ordered Mr. Thomas unilaterally took marital monies and placed them in an American Savings account. Mr. Thomas spent monies from that account in disregard of the Court['s] orders.
 {¶ 19} "The Court orders Mr. Thomas shall solely and exclusively pay the second mortgage for violating the Court's order. ***."
 {¶ 20} The record shows that in July 2000, Robert opened a secret account at American Savings Bank depositing $11,655.07 in the account. Robert admitted opening the account to hide money from Debbie. Robert used $5,606 from the account to purchase the car for Melissa. Robert subsequently closed the account in September 2000, that is before he filed for divorce in October 2000. The existence of the account was discovered during discovery.
 {¶ 21} The foregoing shows that Robert opened and closed the secret account at American Savings Bank before he filed for divorce, thus before the trial court's temporary order requiring the parties to maintain their health insurance policy and to continue to pay their marital debts. The trial court's finding that Robert "spent monies from [the secret] account in disregard of the Court['s] orders" is therefore erroneous. However, the trial court's finding that Robert failed to pay as ordered by the court is not erroneous.
 {¶ 22} When Robert opened the secret account in July 2000, he deposited $11,655.07 in it. When he closed the account in September 2000, the account had a balance of $1,942.26. The first health insurance premium which was due in the fall of 2000 was $1,940. The next premium was due in the first quarter of 2001. By temporary order issued on October 12, 2000, the parties were ordered to maintain their health insurance policy and to pay their marital debts. Because Debbie was then not earning any income, it was the responsibility of Robert to pay the marital debts and the insurance premiums. Yet, despite the $1,942.26 balance from the secret account and the $1,500 he received from selling his truck in March-April 2001, from September 2000 to August 2001 Robert consistently told Debbie they did not have the money to pay the premiums. Robert testified he never considered selling his Ford Mustang or using the money from selling his truck to pay the premiums. Robert never paid the foregoing two premiums.
 {¶ 23} To avoid the lapse of their insurance policy, Debbie was forced to first cash her IRA, and then to borrow from her sister. Robert claimed he did not know Debbie had to cash her IRA and borrow from her sister until after the facts. Robert's failure to pay the premiums, in turn, prompted Debbie to file a contempt motion against Robert, which in turn prompted the opening of a second mortgage on the marital residence. The existence of this mortgage/line of credit on the marital residence was thus directly caused by Robert's refusal and/or failure to pay the premiums. In light of the foregoing and viewing the property division in its entirety, we cannot say that the trial court abused its discretion by ordering Robert to solely and exclusively pay the second mortgage for violating the trial court's temporary order. Robert's fourth assignment of error is overruled.
 {¶ 24} In his second assignment of error, Robert argues that the trial court erred by ordering him to pay Debbie $958.33 a month in spousal support. Robert asserts that the trial court imputed too much income to him and did not impute enough income to Debbie. In her cross-assignment of error, Debbie argues that the trial court abused its discretion by limiting the spousal support order to a ten-year period. Debbie contends that the trial court should have awarded her spousal support for an indefinite duration.
 {¶ 25} A trial court is given broad discretion in determining whether an award of spousal support is appropriate. Holcomb v. Holcomb
(1989), 44 Ohio St.3d 128, 130-131. Likewise, a trial court is given broad discretion in determining the proper amount of spousal support based on the facts and circumstances of each case. Kunkle v. Kunkle
(1990), 51 Ohio St.3d 64, 67. A trial court's award of spousal support will not be disturbed on appeal absent an abuse of discretion. Blakemorev. Blakemore (1993), 5 Ohio St.3d 217, 218-219.
 {¶ 26} R.C. 3105.18(C)(1) sets forth 14 factors a trial court must consider when determining whether to award spousal support, and if so, the amount and duration of the award. Those factors are:
 {¶ 27} "(a) The income of the parties, from all sources ***;
 {¶ 28} "(b) The relative earning abilities of the parties;
 {¶ 29} "(c) The ages and the physical, mental, and emotional conditions of the parties;
 {¶ 30} "(d) The retirement benefits of the parties;
 {¶ 31} "(e) The duration of the marriage;
 {¶ 32} "(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;
 {¶ 33} "(g) The standard of living of the parties established during the marriage;
 {¶ 34} "(h) The relative extent of education of the parties;
 {¶ 35} "(i) The relative assets and liabilities of the parties ***;
 {¶ 36} "(j) The contribution of each party to the education, training, or earning ability of the other party ***;
 {¶ 37} "(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
 {¶ 38} "(l) The tax consequences, for each party, of an award of spousal support;
 {¶ 39} "(m) The lost income production capacity of either party that resulted from that party's responsibilities;
 {¶ 40} "(n) Any other factor that the court expressly finds to be relevant and equitable."
 {¶ 41} The trial court first imputed Robert an annual income of $43,632.50 based upon the following findings: "In tax years 2000, 1999, and 1998 the business earned gross receipts in the amount of $70,500.00, $97,550.00 and $123,900.00 respectively. *** After expenses, the net income was $18,833.00, $41,752.00, and $51,857.00, respectively. During the first half of 2001, the business earned approximately $37,325.00. The office expenses for that same period totaled $24,927.65. *** Mr. Thomas anticipates those expenses to increase during the last half of 2001 because association fees become due.
 {¶ 42} "***
 {¶ 43} "Mr. Thomas' business practices were relatively simple. When a new real estate appraisal or whole house inspection was called into the office the call was logged in the ledger book. Mr. Thomas presented the Court with a series of ledgers.
 {¶ 44} "*** [T]he Court ordered a series of additional documents. The first set of documents ordered was the invoices [for 2000]. The Court converted each set of invoices into a spreadsheet analysis. The Court then consolidated the ten sets of invoices into one spreadsheet to obtain an overall analysis of the income earned, according to the invoices, in 2000.
 {¶ 45} "The Court also ordered the production of the [2000] logbook [aka the ledger]. *** The Court converted the ledger into a spreadsheet analysis. The Court then compared the total earnings of the invoices with the total earnings of the ledger. The total invoice earnings were $69,820.00. The total ledger earnings were $77,632.50. The total earnings discrepancy was $7,812.50.
 {¶ 46} "The Court also ordered the production of the [three] bank accounts. *** The Court converted the accounts into a spreadsheet analysis. The Court then merged the three accounts into one spreadsheet analysis in an attempt to determine how money was transferred from one account to another. A review of the bank records reveal the parties did not clearly transfer money from the business account to the personal account. The Court finds the parties commingled monies without a traceable pattern.
 {¶ 47} "The Court finds the business earned approximately $77,632.50 in tax year 2000. The Court has considered the business expenditures and finds $34,000.00 of said expenses is ordinary and necessary. The Court finds Mr. Thomas has an income in the amount of $43,632.50.
 {¶ 48} "The Court ordered, for comparison purposes, the 2001 ledger. Mr. Thomas informed the Court the business no longer maintains a ledger." (Exhibit numbers omitted.)
 {¶ 49} Upon reviewing the record, we find there is evidence supporting the trial court's foregoing findings. First, the record supports the finding that the total earnings from the invoices submitted by Robert is less than the total earnings from the original 2000 ledger book ordered by the trial court. The record also shows that the copy of the 2000 ledger book submitted by Robert had two less pages than the original 2000 ledger book ordered by the court. The missing pages amounted to about $6,110.
 {¶ 50} Robert had essentially three accounts: the business account for his appraisal and home inspection business, the rental account for the rental properties, and the parties' checking account. Robert testified that not all of the checks received for work performed as a real estate appraiser and/or home inspector were deposited into the business account. As a result, the totality of the deposits in the business account was less than the total income actually earned by the business. Robert also testified that some of the cash rental payments were not deposited into the rental account or the other two accounts but instead were spent by him.
 {¶ 51} The record also shows that rental payments and payments received for appraisals and home inspections were not systematically deposited into their corresponding account. Rather, money was routinely commingled between the three accounts. In addition, expenditures under the business account were actually expenditures for both the business and the rental properties.
 {¶ 52} In light of the foregoing and upon reviewing the trial court's findings, we find no abuse of discretion in the trial court's decision to impute Robert an annual income of $43,632.50 for the purpose of determining his spousal support obligation.
 {¶ 53} The trial court next imputed Debbie an annual income of $14,500 and awarded her spousal support for a period not to exceed ten years. The trial court's imputation and award were based upon Debbie's employment history during the marriage and her decision to stay home for Melissa's benefit. The trial court noted that prior to accepting employment at the law office earning $7 an hour, Debbie had made other attempts to secure employment. The trial court found, however, that despite these efforts, Debbie had voluntarily chosen to limit her employment opportunities by choosing not to return to teaching.
 {¶ 54} The trial court further found that (1) unlike Robert, Debbie's earnings were not relative to her earning abilities, (2) Debbie was in good physical, mental, and emotional health, (3) Debbie was not limited in her ability to work as a result of a minor child, (4) Debbie needed time and expense to acquire education and training, (5) Debbie intended to acquire more office technology skills, (6) Debbie had lost income production as a result of caring for Melissa, and (7) Debbie was significantly limiting her ability to equalize earnings, obtain health insurance and accrue retirement benefits by failing to obtain re-certification in teaching.
 {¶ 55} Upon reviewing the record, we find there is evidence supporting the trial court's findings. Debbie made several unsuccessful attempts to obtain full time employment in secretarial/clerical positions but eventually realized she did not have the required computer skills. A computer class she had registered for was cancelled before it began. She ultimately took the part-time job at the law office because she needed money. Debbie admitted she had not thought about looking for employment outside of Middletown or working at a fast food or gas station if she was offered a full time position or more than $7 an hour.
 {¶ 56} Debbie testified she would need six to nine semester hours to get re-certified as a teacher at a cost of about $900-$1,000. Debbie acknowledged that a starting salary for a teacher in Middletown is $26,000 with benefits. Debbie testified, however, that she had taken no steps to get re-certified as a teacher as she had no plans or interest in teaching anymore. Debbie explained that while occasionally teaching as a substitute teacher between September 2000 and September 2001 (no updated certificate is required for a substitute teaching position), she felt "out of the loop" and quickly realized she no longer wanted to teach. Debbie hoped to make eventually $10-$12 an hour working in an office especially after updating her computer skills.
 {¶ 57} The $14,500 annual income imputed to Debbie amounts to what she would be earning at the law office were she working full time rather than 15 to 20 hours per week. Upon thoroughly reviewing the record and the trial court's findings, we find no abuse of discretion in the trial court's decision to impute Debbie an annual income of $14,500 for purposes of calculating spousal support. Robert's second assignment of error is overruled.
 {¶ 58} We now turn to the duration of the spousal support award and Debbie's cross-assignment of error. Debbie asserts that in marriages of long duration such as hers (the parties were married about 24 years), an indefinite term is presumed. As a result, the trial court should have awarded her spousal support for an indefinite period. We disagree.
 {¶ 59} In cases involving a marriage of long duration, parties of advanced age, or a homemaker spouse with little opportunity to develop meaningful employment outside the home, a trial court may, in the proper exercise of its discretion, award spousal support for an indefinite period. Kunkle, 51 Ohio St.3d at 69. Thus, contrary to Debbie's assertion, an award of spousal support of indefinite duration is not presumed simply because the parties' marriage was of a long duration. Rather, a marriage of long duration permits a trial court to award spousal support of indefinite duration. See Woodrome v. Woodrome (Mar. 26, 2001), Butler App. No. CA2000-05-074.
 {¶ 60} While the parties' marriage qualifies as a marriage of long duration, see id., we nevertheless find that the trial court did not abuse its discretion by awarding spousal support for a period not to exceed ten years. Considering the facts of this case, including the fact that Debbie is in good health, has several years of employment ahead of her, has a college education, could get re-certified as a teacher if she wanted to and start earning $26,000 a year with benefits, and has a good potential for self-support once she updates her computer skills or gets re-certified as a teacher, the fact that Melissa is emancipated, and the fact that the trial court reserved jurisdiction over the issue of spousal support, we cannot say that the trial court's decision to award spousal support to Debbie for a period not to exceed ten years is so unreasonable, arbitrary, or unconscionable as to amount to an abuse of discretion. Debbie's cross-assignment of error is overruled.
 {¶ 61} Judgment affirmed.
[1] We note that while the trial court found each party had received net marital equity in the amount of $258,344.10, our calculations show that the parties each received net marital equity of about $285,344.10 ($285,342.10 for Debbie and $285,344.11 for Robert). It appears the trial court transposed the numbers 5 and 8.